UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| UNITED STATES OF AMERICA, | Case No. 1:19-cr-00233-DCN-2 |
|---|---|
| Plaintiff, | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| ROBERT B. MAHAN, JR., | |
| Defendant. | |

## I. INTRODUCTION

Pending before the Court is Defendant Robert B. Mahan, Jr.'s Motion to Suppress and Second Motion to Suppress. Dkts. 83, 85. The motions have been fully briefed and an evidentiary hearing was held on February 17, 2021. Upon review, and for the reasons set forth below, the Court DENIES Mahan's Motions.

## II. BACKGROUND

In January 2019, co-Defendant Derek Tuschoff became the focus of a drug investigation when Detectives from the Idaho State Police ("ISP") learned from a cooperating source that Tuschoff was distributing methamphetamine in the Boise area. Detectives began an extensive surveillance of Tuschoff that included multiple abandoned garbage collections ("trash pulls"). The trash pulls found items indicative of drug paraphernalia. The surveillance also included investigators following Tuschoff and observing several meetings within parking lots that investigators believed to be drug deals.

Traffic stops of the people Tuschoff met with led to those individuals admitting that the meth and heroin in their possession had been sold to them by Tuschoff.

In May 2019, detectives requested a search warrant for GPS location data for Tuschoff's cellular phone which United States Magistrate Judge Candy W. Dale signed and authorized. Through this location data, detectives learned that Tuschoff had traveled to Phoenix, Arizona, and subsequently found that, while in Arizona, he had been in contact with James Stark, a known methamphetamine dealer. Detectives obtained an extension to the previous search warrant and continued tracking Tuschoff's phone.

On June 30, 2019, Tuschoff's cellular location pings indicated that he traveled to eastern Idaho. He was observed at a hotel in Pocatello, Idaho, and detectives verified his car was in the hotel's parking lot. Detectives called the hotel to confirm if Tuschoff had checked in but learned that, while Tuschoff had not rented a room in his name, another guest was flagged as suspicious. That guest was Robert Mahan and he had provided the hotel with an Arizona driver's license. At that time, detectives believed that Tuschoff's source of drugs was in the Phoenix area based on his previous trip to Phoenix. Mahan, Tuschoff, and Mahan's girlfriend, Brooke Chamberlain, shared the hotel room that night.

On July 1, 2019, the following day, ISP detectives observed Mahan, Chamberlain, and Tuschoff load items into Mahan's and Tuschoff's cars and speak multiple times in the parking lot. At one point, Mahan and Tuschoff walked behind the dumpster. Chamberlain was observed tossing a white grocery bag into the dumpster. After they left the parking lot, a detective found a white grocery bag matching the description of the one Chamberlain had discarded and discovered that it contained a burnt foil with suspected heroin residue.

MEMORANDUM DECISION AND ORDER - 2

Approximately three hours later, at 2:40 p.m., Tuschoff's car was stopped by police. Police found 785.62 grams of methamphetamine, 234 fentanyl pills, and what appeared to be a drug ledger. After Tuschoff's arrest, detectives learned that he had made two money order payments in the amounts of $1,600 and $1,500 to Mahan.

At the same time as Tuschoff's arrest, detectives followed Mahan and Chamberlain in a white Chevy Camaro confirmed by Hertz to be a rental car rented by Robert Mahan, Sr. At 2:45 p.m., ISP detectives saw Mahan and Chamberlain arrive at the Fort Hall Casino. Mahan rented a hotel room there for the night. At about 4:50 p.m., ISP Corporal Tyler Scheierman took his drug-detection dog, Bingo, to conduct a free air sniff around Mahan's rental car in the parking lot, but the dog did not alert to drugs at that time. At about 5:47 p.m., Fort Hall Tribal Police Department Detective Tuia confirmed with detectives that Mahan had rented a room and shared the contact information he had given the hotel, including a phone number that Detectives learned had been in contact with Tuschoff's phone 76 times between June 19, 2019, and July 1, 2019.

On July 2, 2019, Detective Tuia told detectives that Chamberlain and Mahan were going to be kicked out of the hotel because they were smoking in their hotel room. Detectives watched as Chamberlain and Mahan loaded luggage and belongings into their car. ISP detectives and Detective Tuia hand-searched Chamberlain and Mahan's vacated room and found an item of heroin-smoking paraphernalia wrapped inside a towel.

At about 12:26 p.m., ISP troopers and a Drug Enforcement Administration ("DEA") agent stopped Mahan and Chamberlain for speeding and crossing the fog line while driving. An officer approached the passenger side of the car and gestured for Chamberlain

to roll down the window. She complied. The officer spoke to both Mahan and Chamberlain through the rolled down passenger side window and then asked Mahan to step out of the vehicle. Mahan complied. After he exited the vehicle, Mahan was pat down and positioned in front of a patrol car that had the dash cam running. There were approximately ten officers on scene.

About seven-minutes later, Pocatello Police Corporal Shane Jones and his drug-detection dog, Jaco, arrived on scene. Corporal Jones walked Jaco on a leash to the rear bumper of Mahan's vehicle and then to the passenger side of the car. Jaco jumped through the still open passenger side window and alerted on a bag within the car. After Jaco alerted, Mahan and Chamberlain were handcuffed. Detectives hand-searched the car, including the peach or pink purse within the car, and found 34.43 grams of actual methamphetamine, fentanyl pills, marijuana, $37,500 in cash, an electronic money counter, and other drug paraphernalia.

Mahan now moves to suppress the evidence seized from the vehicle alleging the officers violated his Fourth Amendment rights by (1) deviating from the original purpose of the traffic-stop, (2) delaying the stop to allow a drug dog to arrive without probable cause, (3) searching the car without probable cause (as Jaco's alert was either unreliable or a trespass itself), and (4) arresting him.

The Court held an evidentiary hearing on the Motion to Suppress on February 17, 2021 and took the matters under advisement.

### III. LEGAL STANDARD

The Fourth Amendment guarantees the right of individuals "to be secure in their

MEMORANDUM DECISION AND ORDER - 4

persons, houses, papers, and effects, against unreasonable searches and seizures." *Mapp v. Ohio*, 367 U.S. 643 (1961). Generally, searches and seizures conducted without a warrant are "*per se* unreasonable under the Fourth Amendment" subject to "a few specifically established and well delineated exceptions." *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993) (citations omitted).

An exception to the warrant requirement that is pertinent to this case is a seizure for a traffic violation. *Rodriquez v. United States,* 575 U.S. 348, 354 (2015). Such a seizure is only justified if the officer diligently pursues the purpose of the stop; any deviations or delays for unrelated investigations violate the driver's Fourth Amendment right, unless supported by independent reasonable suspicion. *Id*. at 354-55.

Additionally, the automobile exception to the warrant requirement permits police to search a vehicle when the car is "readily mobile" and "probable cause exists to believe it contains contraband." *United States v. Davis*, 530 F.3d 1069, 1084 (9th Cir. 2008) (cleaned up). The police may search both an automobile and the containers within it "where they have probable cause to believe contraband or evidence is contained." *California v. Acevedo*, 500 U.S. 565, 580 (1991).

That said, if no exceptions to the exclusionary rule apply, evidence must be suppressed. Evidence that the government obtains in violation of the Fourth Amendment is generally excluded from the prosecution of the alleged violator. *Wong Sun v. United States,* 371 U.S. 471, 484-85 (1963). Further, evidence discovered through "exploitation of" an illegal search or seizure, must also be suppressed as "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 488 (1963).

MEMORANDUM DECISION AND ORDER - 5

# IV. ANALYSIS

Mahan argues that law enforcement deviated from the purpose of the traffic stop—which was to investigate and cite Mahan for driving over the speed limit and crossing the fog lane—to facilitate an independent drug investigation. He further argues that law enforcement delayed issuing the citation in order to allow time for the dog sniff. In sum, Mahan alleges law enforcement did not have reasonable suspicion to justify the deviation from the purpose of the traffic-stop, nor justification for the delay.

Mahan further contends that the drug detection dog, Jaco, gave an unreliable and unidentifiable alert and that Jaco's entrance into Mahan's vehicle was aided by law enforcement without probable cause or permission.

Finally, Mahan argues that he was placed under arrest as soon as he stepped out of his vehicle and that, at that point, law enforcement lacked probable cause for his arrest.

Mahan asserts all resulting evidence against him must be suppressed. The Court will address each issue below.

### A. The Delay

*1. Unreasonably Delay*

The initial issue in this case lies in whether law enforcement delayed Mahan's traffic-stop by acting outside of the purpose of the stop's mission. If the Court finds there was such a delay, it must determine if the delay was justified by a reasonable suspicion of drug activity.

Broadly speaking, the tolerable duration of police inquiries in a traffic-stop context is determined by the seizure's "mission." *Rodriguez*, 575 U.S. at 354. Beyond determining

whether to issue a traffic ticket, an officer's "mission" during a traffic stop typically includes checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly. *Id.* at 355.

A dog sniff is not "an ordinary incident of a traffic-stop." *Id.* at 355-56. Accordingly, inquiries or action (such as a dog sniff) that measurably extend the duration of the stop and that are outside of the purpose of the stop's mission must be justified by reasonable suspicion independent of the traffic investigation. *Arizona v. Johnson*, 555 U.S 323, 333 (2009). Finally, the facts forming reasonable suspicion must be based upon "objective observation" and the inferences law enforcement draws from those facts must be "objectively reasonable." *United States v. Sigmond-Ballesteros*, 285 F.3d 1117, 1123 (9th Cir. 2002).

In sum, there must be reasonable suspicion to prolong any seizure; otherwise, law enforcement's actions must not unreasonably prolong the duration of the seizure.[1] As it relates to a dog sniff, the act must either not delay the traffic stop at all, or if it does, there must be a reasonable suspicion of criminal activity for the delay to be justified

Mahan argues law enforcement delayed the traffic-stop generally without pointing to any specific police actions that lead to the delay. Instead, Mahan relies on arguments

---

[1] It goes without saying that *some* incremental delays are per se reasonable simply due to the nature of police work. As the United States Supreme Court has noted, "traffic stops are especially fraught with danger to police officers." *Arizona v. Johnson*, 555 U.S. 323, 330 (2009) (cleaned up).

that law enforcement deviated from the original purpose of the stop by never pursuing an investigation of the traffic violation and the fact that there was a seven minute delay from the start of the stop to when the drug-detection dog, Jaco, arrived on scene.

The problem with Mahan's argument is it does not take into account the two-fold nature of the traffic stop. As Detective Edgley testified, this was a pretextual stop. To be sure, Mahan was pulled over for traffic violations; however, the overarching reason for the stop was the ongoing drug investigation and law enforcement's suspicions that Mahan and Chamberlain were involved in illegal activities.

A pretext stop is permissible if the officer has objective, probable cause that a driver is violating a traffic law. *See United States v. Wallace*, 213 F.3d 1216, 1219 (9th Cir. 2000), *as amended* (July 7, 2000) (explaining, "[t]he fact that the alleged traffic violation is a pretext for the stop is irrelevant, so long as the objective circumstances justify the stop"). Objectively, Mahan's stop was legal because he was speeding and crossed the fog line—both violations of Idaho law. Further, that officers only minimally investigated those traffic violations and instead focused on their narcotics investigation is of no import. *See e.g.*, *Whren v. United States*, 517 U.S. 806, 812–13, (1996) ("an ulterior motive [does not] strip [law enforcement] of their legal justification[s]" for a warrantless search, nor is a "traffic-violation arrest . . . rendered invalid by the fact that it was a mere pretext for a narcotics search") (cleaned up)).

In short, there was no delay here because officers were conducting a drug investigation from the outset of the stop. Nevertheless, even if it could be said that there was some delay between the "original" traffic stop and the drug investigation, such is

MEMORANDUM DECISION AND ORDER - 8

permissible if the delay is necessary in light of an officer's reasonable suspicion of illegal activity. The Court addresses this issue next.

*2. Reasonable Suspicion*

Even were the Court to determine that law enforcement unreasonably prolonged the duration of the traffic-stop, if supplemented with a reasonable suspicion of criminal activity, the delay is justified.

Mahan was initially pulled over for speeding and crossing the fog line. However, there was also evidence showing that he had been engaged in drug trafficking at the time of the stop. The Government argues that it was reasonable for law enforcement, given the collective knowledge of the detectives, to take time to dispel the suspicions with a drug dog sniff.

The Ninth Circuit has held that reasonable suspicion may be based on the collective knowledge of all officers involved in an investigation. *United States v. Hoyos*, 892 F.2d 1387, 1392 (9th Cir. 1989). This is true "even if some of the information known to other officers is not communicated to the arresting officer." *United States v. Butler*, 74 F.3d 916, 921 (9th Cir. 1996). "The accepted practice of modern law enforcement is that an officer often makes arrests at the direction of another law enforcement officer even though the arresting officer himself lacks actual, personal knowledge of the facts supporting probable cause [. . .] in such situations, a probable cause determination is based on the collective knowledge of the law enforcement personnel." *United States v. Jensen*, 425 F.3d 698, 704 (9th Cir. 2005).

Co-Defendant Tuschoff had been the subject of a six-month investigation before

Mahan was stopped. Detectives knew that Tuschoff was distributing drugs in Idaho after surveillance, trash pulls, and interviews of individuals who admitted to purchasing drugs from Tuschoff. Detectives knew that Tuscoff was receiving his drugs from Phoenix, Arizona, and that Mahan had an Arizona driver's license. They knew Tuschoff had been arrested and found in possession of approximately two pounds of methamphetamine after he shared a hotel room with Mahan and Chamberlain. Detectives knew that Tuschoff had wired two money orders to Mahan – one for $1,600 and one for $1,500. Detectives also knew that one of the hotels Mahan had stayed in that same day had contained drug paraphernalia and that Mahan's girlfriend, Chamberlain, had been seen at the other hotel throwing a plastic bag that contained drug paraphernalia into a dumpster. This was all known to law enforcement before the traffic stop was conducted.

Although the Court agrees that the Fourth Amendment does not permit officers to prolong a traffic stop in order to establish reasonable suspicion to conduct a dog sniff, here, the Court finds the officers *had* reasonable suspicion to conduct the dog sniff from the outset based upon their months-long investigation of Tuschoff and *could* prolong the traffic stop if required. The Court will next address the search.

**B. The Search**

Mahan next argues his Fourth Amendment rights were violated when the Officers searched his car because Jaco's alert was unreliable and did not provide probable cause for the search. He also argues that Jaco trespassed by entering his vehicle during the sniff.

When police conduct a warrantless search of a vehicle following an "alert" by a drug-detection dog, the government bears the burden of showing that the dog's alert was

MEMORANDUM DECISION AND ORDER - 10

reliable. *Florida v. Harris*, 568 U.S. 237 (2013). In *Harris*, the Supreme Court held that a reviewing court can presume the reliability of a drug dog if "a bona fide organization has certified [the] dog after testing his reliability in a controlled setting . . . ." *Id*. at 246-47. And even if the dog has not been certified, the court may deem an alert reliable if the dog "has recently and successfully completed a training program that evaluated his proficiency in locating drugs." *Id*. at 247. The test for probable cause is viewed through the lens of common sense, whether "all the facts surrounding a dog's alert, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Id*. at 248.

Mahan argues the government cannot show that Jaco gave a reliable alert, however, when looking at the evidence from a reasonably prudent person standard, Jaco had received certification and completed hundreds of hours of training in the year preceding the traffic-stop. Dkt. 99, at 11. This shows Jaco's capability and supports the argument that the alert was sufficiently reliable to establish probable cause the day of the warrantless search. Further, when considering "all of the facts" surrounding Jaco's alert—as the Court has already discussed above—a reasonably prudent person would find a search likely to reveal evidence of criminal activity and legal under the circumstances.

Additionally, Mahan argues that Jaco unlawfully trespassed in the vehicle when he jumped through the open passenger-side window to search the interior. Jaco's jump through the window is not contested, but Mahan argues that it was done with the aid of law enforcement while the Government argues that Jaco's entrance was merely a "response to his sniffing an odor he is trained to detect and was not facilitated by his handler." Dkt. 99,

MEMORANDUM DECISION AND ORDER - 11

at 11. There are no Ninth Circuit cases identified by either party on this issue, but other courts have found that the instinctive actions of trained drug dogs do not expand the scope of an otherwise legal dog sniff to an impermissible search without a warrant or probable cause. See *United States v. Pulido-Ayala*, 892 F.3d 315, 319 (8th Cir. 2018) (police officers had probable cause to believe that stopped vehicle contained contraband in moment before drug-sniffing dog jumped into vehicle through open door); *United States v. Sharp*, 689 F.3d 616, 620 (6th Cir. 2012) (no search violation when dog jumped through open window without facilitation by police); *United States v. Pierce*, 622 F.3d 209, 214–15 (3d Cir. 2010) (no illegal search when, without facilitation by police, dog entered car door opened by Defendant); *United States v. Lyons*, 486 F.3d 367, 373–74 (8th Cir. 2007) (no Fourth Amendment violation when, without facilitation by police, dog's head entered window opened by passenger); *United States v. Stone*, 866 F.2d 359, 364 (10th Cir. 1989) ("dog's instinctive actions did not violate the Fourth Amendment" when he jumped in hatchback that was not opened and police did not encourage entry). While there are no Ninth Circuit cases on point, the Court finds the reasoning of the Circuits cited very persuasive. The Court agrees that instinctive actions of the dog do not expand the scope of the sniff.

In sum, the evidence shows, and the Court finds, that Jaco's alert satisfies the reliability test, as well as the common-sense test, provided probable cause for the Officers to search Mahan's vehicle, and the physical trespass did not expand the scope of his sniff.

**C. The Arrest**

Finally, Mahan argues that he was placed under arrest when he complied with law enforcement by getting out of his vehicle at the beginning of the stop and that law

enforcement lacked probable cause for an arrest at that point. The Court will first decide at what point Mahan was arrested (if at all) and then decide whether probable cause existed at that point for the arrest.

*1. The Arrest*

There is a fine line between being detained and being arrested and that line is not always clear. An officer may detain a person no longer than necessary to confirm or dispel suspicion. *See Adams v. Williams*, 407 U.S. 143, 146 (1972) (brief stop of suspicious individual in order to determine identity or maintain status quo while obtaining more information may be reasonable in light of facts known to officer at time). A seizure or detention, however, may ripen into a de facto arrest for which probable cause is then required.[2] There is no "litmus-paper test . . . for determining when a seizure exceeds the bounds of an investigative [*Terry*] stop." *Florida v. Royer*, 460 U.S. 491, 506 (1983). In determining whether an investigative detention has ripened into an arrest, courts consider the totality of the circumstances. *United States v. Baron*, 860 F.2d 911, 914 (9th Cir. 1988); *see also, United States v. Sharpe*, 470 U.S. 675, 685 (1985).

Whether an arrest has occurred "depends on all of the surrounding circumstances, including the extent that freedom of movement is curtailed and the degree and type of force or authority used to effectuate the stop." *United States v. Patterson*, 648 F.2d 625, 632 (9th Cir. 1981). The Court must "review the situation from the perspective of the person seized,"

---

[2] It is well-settled that a warrantless arrest must be based upon probable cause. *Ker v. State of Cal.*, 374 U.S. 23 (1963), *Brinegar v. United States*, 338 U.S. 160 (1949), *Carroll v. United States*, 267 U.S. 132 (1925).

MEMORANDUM DECISION AND ORDER - 13

assessing whether "a reasonable innocent person in these circumstances would . . . have felt free to leave after brief questioning." *United States v. Delgadillo-Velasquez*, 856 F.2d 1292, 1295–96 (9th Cir. 1988); *see also Patterson*, 648 F.2d at 632 (clarifying that "the question is whether, under all of the circumstances, 'a reasonable person would conclude he was under arrest'") (citing *United States v. Harrington,* 636 F.2d 1182, 1186 (9th Cir. 1981)).

Mahan's most heavily relied upon argument is that he was placed under arrest when he was "instantly pulled from his vehicle" when the stop began. Dkt. 85, at 9.³ However, a *Terry*-stop is not transformed into a de facto arrest when an individual is removed from his or her vehicle or even when a defendant is moved from the street to the back of a police car. *United States v. Baron*, 860 F.2d 911, 915 (9th Cir. 1988); *see also United States v. Bautista*, 684 F.2d 1286, 1289-90 (9th Cir. 1982) (holding a brief but complete restriction of liberty, such as handcuffing the suspect, can be permissible during a *Terry* stop and does not convert the stop into an arrest). As such, it is improper to assume that Mahan's voluntary move from his vehicle to stand with officers in front of a police car automatically constitutes an arrest.

Taking into account the totality of the circumstances, there was little to no force shown by the officers when Mahan voluntarily stepped out of his vehicle. While multiple officers were on scene, only two to three were near Mahan at any given time to talk with him. After Mahan stepped out of his car, he was with a number of officers on the side of

---

³ A review of the video footage provided by counsel shows that Mahan was not physically "pulled" from his vehicle, but simply got out when asked to do so by police.

MEMORANDUM DECISION AND ORDER - 14

the road, but that is not an uncommon environment during traffic stops or for investigations into drug trafficking while awaiting a dog sniff. Mahan's freedom of movement was hardly curtailed as he was not even placed in handcuffs until *after* the drug dog had alerted. Dkt. 85, at 7. He merely stood on the side of the road with officers for a reasonable period of time awaiting a dog sniff of his vehicle. As these are ordinary circumstances, they would not lead a reasonable person in Mahan's situation to believe that he was under arrest.

Although Mahan relies on his voluntary move from inside his vehicle to standing in front of the police car as evidence of a de facto arrest, it does not meet the standard that a reasonable person would believe they were under arrest when coupled with ordinary circumstances such as police presence and being on the side of a road after an initial traffic violation. The Court agrees that Mahan was merely detained during this period. Mahan was not arrested until he was handcuffed and formally placed under arrest following the drug dogs' alert.

2. *Probable Cause*

Mahan was not arrested until he was handcuffed following the lawful dog sniff, and the Court finds there was sufficient probable cause at the point for his arrest. Most of Mahan's arguments within his Second Motion to Suppress focus on the idea that officers lacked probable cause for his arrest when he stepped out of his vehicle. However, since he was not arrested until later, those arguments are not persuasive to the Court. Additionally, those arguments do not change the Court's conclusion that *following the valid dog alert*, officers *did* have probable cause to effectuate an arrest.

Mahan's arguments against the dog's alert being reliable and the dog's physical

MEMORANDUM DECISION AND ORDER - 15

entry amounting to trespass rendering it unconstitutional itself have also been dismissed. As such, at the time of Mahan's arrest there was probable cause for his arrest based on all the previously discussed facts, most notably: the investigation and arrest of Tuschoff that implicated Mahan's involvement, the suspected drug paraphernalia collected from both hotels, and the valid drug detection dog's alert on Mahan's vehicle.

## V. CONCLUSION

In sum, there was no delay or deviation from the purpose of the stop as officers were conducting a permissible drug investigation with reasonable suspicion from the outset of the stop. Additionally, there was no Fourth Amendment violation stemming from the drug dog's sniff and subsequent search as Jaco's alert satisfied the reliability test, as well as the common-sense test, provided probable cause for the Officers to search Mahan's vehicle, and the physical trespass did not expand the scope of his sniff. Finally, as Mahan was not placed under arrest until he was handcuffed, there was probable cause for his arrest from the search of his vehicle and the surrounding circumstances.

## VI. ORDER

NOW, THEREFORE, IT IS HEREBY ORDERED:

1. Mahan's Motion to Suppress (Dkts. 83, 85) are **DENIED.**

DATED: April 9, 2021

David C. Nye
Chief U.S. District Court Judge